Engineering v. Campbell Company 2017, 1974, and 2033. Mr. Holland. Thank you, Your Honor. Good morning. May it please the court, my name is Chris Holland. I represent the appellant, Campbell Company of Idaho, and I'm here today to ask this court to use its review powers to overturn the jury verdict that was passed. This case presents, really, Your Honors, a perfect storm, if you will, of invalidity issues. At the outset, during the examination, an amendment was allowed before issuance wherein that amendment comprised simply taking the exact language from the cited reference and putting it into the claims, and then the patent was issued. So from the word go, this patent should not have been issued, but unfortunately it was. Then you go to the motion stage, and at the summary judgment proceeding, my client, looking back at the record, clearly was arguing or attempting to argue that it was practicing what was the prior art, which of the signals. Yes, sir. As I understand it, the jury found that there was no invalid in public use here because the two uses that occurred outside of the grace period were experimental. Is that my understanding of the jury verdict correctly? Your understanding is correct, Your Honor, and we are challenging that absolutely, and I'd be happy to address that. And what I understand you to be saying is that the first experiment in California was appropriately experimental, but that the second one was not. No, I apologize, Your Honor, you are misunderstanding. I'm sorry if we didn't clarify that well enough in the brief. We don't think any of those uses qualify as experimentation, unless you're talking about, I think, the one on their parking lot. That, I think, may have been arguably experimental, but there's two external uses of the device, which went on for a period of more than one year. In California? In California, in Fullerton, California, Your Honor, yes, at two different intersections. One was at what was called the Gilbert installation or Fullerton 1. The second one was at the State College installation or Fullerton 2. And both of those... Why isn't this like the tested outdoors? Public safety is involved. You needed to have it really fully operative and tested because someone can walk across the street and get killed, and this was a jury verdict. Yes, Your Honor. It's not like City of Elizabeth because of the clock spring factors and the analysis that one would put into place where the testing that was going on was not directed towards any aspect of the claims. That's the problem that they face with this experimental use. It doesn't have to be. Clock spring made clear it was either to ensure that the claim limitations are satisfied, but also that it would work for its intended purpose. And my understanding is that that is their theory as to why these two uses were experimental, because they were trying to see if it would work for its intended purpose. And I have some difficulty in seeing why the first one of those two wasn't designed to see it would work for its intended purpose, but the second one is perhaps more problematic given the testimony. Agreed, Your Honor, but I would submit that both of them were correctly... should correctly be reversed on the issue of public usage for exactly the point of, is it ready for patenting and has it been reduced to practice? And yes, when you take it out for, let's assume for... But that ignores the case law that says you can still have that and take it out for public testing. I mean, your argument on that point would suggest that once it's ready for patenting, you can't take it out in the public at all, and that's not the case law. I absolutely agree, Your Honor, and I'm sorry if the court was given that impression that it's not possible to do some level of public testing. The point is, is what period of time would be legitimate public testing? And the inventor himself admitted that whatever issues were going on, which were identified only as noise and durability, noise and durability are not in the claims, so those were not testing directed to the claims per the clock spring and the Helsin factors. So that durability is testing whether it's going to be useful for its intended use. Agreed, Your Honor. That's inherent in this kind of invention, isn't it? I mean, these are not traffic lights or whatever that are going to be used in somebody's home. They're going to be used at actual intersections. Agreed, in theory, Your Honor, and... Well, not in theory. They're not going to install these in private locations. They're going to install these in public streets. Understood, and in theory, I apologize, Your Honor, what I was saying is in theory, yes, you should have some amount of testing, and the problem we face here is that the inventor himself said the only issues that they have are days in one installation or weeks in the other, and then we have months and months and months, more than one year, agreed to on the record of usage when it already has been found to be functionally fine. But we don't know if it was durable or not. Isn't that why we look at these multiple factors and clock spring? To determine a lot of different things. I mean, under your theory, if somebody invents the perfect invention and takes it out, and there's no problems within a week or so, then maybe they need to file their patent. But what if this is an invention that's supposed to, you know, have durability of 10 or 15 years, a week's testing, without any rain or any snow, or well, it's California, no snow, but you know what I mean. Yes. How do we know when the length of time is too long? Aren't we supposed to look at these factors, and in looking at these I mean, I think that the factors weigh more heavily in favor of your friend on the other side. Respectfully, Your Honor, I would disagree for a couple reasons. One would be the admissions of the inventor himself about the length of time it took him to understand whether it was functioning correctly or not. The lack of documentation is the primary one. There is no documentation. There's no lab notebooks. There's no inventor's records. There's no change orders. There's nothing to suggest that for The only time we heard about testing was during the litigation when it was brought up when they realized, my gosh, we've got an installation 33 months before we went and filed for a patent. And assuming... Did they get paid for that? Pardon me? Did they get paid for any of those 33 months? They did not get cash for it. There's one marketing letter that was produced, and that marketing letter from January of 2002, I believe it's 3728 in the record, Your Honor, showed that what they did was they negotiated a quid pro quo with the city of Fullerton for multiple additional installations, which the marketing group at Polaro would then utilize for marketing the useful invention as it was being displayed in the public. So, yes, there were quid... Wasn't all this decided and considered and decided by the jury, including his testimony? After all, he wasn't a patent attorney and might not have understood the consequence of what he was saying. But the jury evaluated all this. Yes, Your Honor, they did, but again, we believe that the problem with that evaluation was that in determining whether the use was public or not, they did not properly evaluate these issues that were before them, and it's an issue of clear air and whether there's substantial evidence to support that. What they had, and I believe that part of this goes to the issue of validity. You know, we had lost, my client had lost on infringement, so you're there trying to simply defend yourself on the validity issue, and on validity, the instructions were given incorrectly, and as a result, they're believing that the court had found infringement and our clients are bad actors. What was the error in the instructions? The error in the instructions was the fact that a different standard was utilized at the claim construction and summary judgment phase. Did they object? Yes, they did. The record is replete with objections as well as a judgment format of law under Rule 50 after the fact, Your Honor, and preservation of the objection. The trial court also multiple times indicated on the record that... What's the error in the jury instructions? The jury instruction was given that the term digital data signals should simply be given its plain and ordinary meaning. That's what the jury was supposed to evaluate, and the problem with that is that at trial, when you're simply looking at validity, that plain and ordinary meaning, the way the Polara expert testified about it, made it sound like digital had to be ones and zeros, and therefore, the Tosemco device, the Wilkinson patent, and the Prior Art device of my own client, Enlightenment, would not qualify, whereas at the summary judgment phase, they had strenuously argued to stretch the claims to cover those devices, and the error then, Your Honor, is the infringement instruction that should have been given, or pardon me, the instruction of a claim to instruction that should have been given, should have been the court's actual interpretation from the summary judgment phase, and that would have at least allowed us on the obviousness and anticipation arguments to have some comeback rather than simply being judged as a known infringer with essentially no defense to the patent being valid or not, and I think that also then spills over into willfulness and the other issues, but that's... But that's all anticipation and obviousness, it's not public use, which is what we were talking about. Yes, Your Honor, and you were asking, I'm sorry, we got down this road because you were asking about, you know, what impact did that have and where was the error, and I was trying to relate it to that. I think the two of them go together. The public use issue... How do they go together? What's the error in the jury's finding of experimental use? I think the error in the jury's finding is that the patentee, the inventor himself, admitted that the patent had been reduced to practice and it was ready for patenting, and to the court's point, some amount of testing... That's not legally sufficient for you to win. You need to show me clear error in weighing all these factors, and when I look at through these factors, I see some of them weigh in your favor, and I see some of them weigh in your friend's favor, and if that's the case, then I don't understand how I can find clear error on a jury verdict. I think that if the court... I think if the court would look at it in terms of things like what the predominating issue that was brought up at the beginning would be, what is the amount of time that's needed for testing? What's the amount of time that's needed there because it's a public safety issue? And for example, in health... That's only one of the factors, though. Yes. You're basically asking me to relay these factors, and that's not what we do as an appellate court. I absolutely don't want that to happen, Your Honor. I do think the factors... I think that the length of time that was needed was only a few days or a week, according to the inventor himself, and it took several months of public Yes, I was trying to answer Judge Hsu's question. But all you're going to do is end up reciting the factors that favor you, but your friend's going to get up and recite all the factors that favor him, and we're not a... we're not the finder of fact here. If there are some factors that favor him and some that favor you, how can we overturn the jury verdict? What I would say is that the factors that he's going to argue, I believe, that favor him all are... favor him only for a limited period of time because the use was shown to be... any experimentation that was shown to have been resolved, and the problem is that... But not all these factors relate to experimentation. Some of them relate to degree of commercialization and whether the inventor monitored things, the nature of contacts with potential customers. Those aren't necessarily time-related. No, Your Honor, you're right, and the problem is the record is actually devoid of anything supporting either side on those. So the ones that he's going to say, that was my point, that support him, in fact, and it actually are neutral at best, there is no evidence on either side about it because there are no records of this, and the problem is with... I'm not... I definitely want the factors to stay exactly the same because I think they come out in my favor. The problem is is that this is the way they... I appreciate that, Your Honor, and that's why we're here. The problem with their interpretation, I believe, is that anyone could use a public use for any amount of time under this scenario. Counselor, you want to save some time for rebuttal? I do, Your Honor. You're well into it. Thank you, Your Honor. I appreciate it. Mr. Dilger, you at the clerk's office wanted to note, save five minutes for the cross-appeal? I don't want to save... I won't be saving... No cross-appeal. Yeah, no cross-appeal. I realized that as I walked away and that she'd already gone back in, but no rebuttal from me. Let me tell you what my problem is here, okay? As I understand clock spring in these other cases, that for something to qualify as an experimental use, it has to be either to test the claim limitations, which is not the situation here, or to determine whether the device would work for its intended purpose. And I think you're quite correct that the first use here in suggest otherwise. My concern is with the second use, which was still outside the grace period, and the testimony that I guess it was the inventor gave at beginning of page 2537 of the joint appendix, in which he said after the first experimental use, he could have filed his patent application, but that he seems to say that the reason that he didn't file the application and conducted the second experiment was for commercial purposes, rather than to test the device to see whether it would work for its intended purpose. And he says that repeatedly on 2737 and 38. He's asked all these factors you're talking about, these were all commercial issues for developing a device, correct? And he says correct. And that happens on more than one place there. So if in fact this was testing for commercialization, it wouldn't qualify as an experimental use. And how do you deal with that testimony? Well, there is a case actually just directly on point here. So there's actually three tests. There is the first two Fulton tests, I'm not including the parking lot. George Dyke is asking about this testimony. Yeah, this is on page, he says 2737? 25, 37, 38, and 39. And I believe it's testimony of the inventor. That's important. That's the weakness of your case. I would think you would have had that in mind. So the question is, it's ready for patent. It's whether he's saying it's ready for patent, or could he file that? He said yes. He said you already had the concept in mind. But the problem is, he said, why did you do the second experiment? And he doesn't say, I still needed to do testing to see that it would work for its intended purpose. What he says instead is there were commercialization issues, and that was the purpose of the second testing. And to do testing for commercial purposes that appears under the cases does not qualify as an experimental use. Well, I think that was in the questioning attorney, he said there was commercial issues. Well, he agreed with it. He says correct. He's an engineer. I don't think he's... He's got to answer the question. We've got to deal with the record that's in front of us. You can't say that he didn't agree with it when he says correct. Okay. Well, look, he's not looking at the case law versus commercial. When he says commercial issues, commercial issues, can you roll this thing out? That's a commercial issue. Can you roll it out to a population of... In other words, commercial issues here relate to the purpose of the invention and for it being safe. Yeah, being safe. And he didn't draw in any money on that. Excuse my last one? And he didn't derive money from... No, he's not saying, look, I needed... we need to start making money. But what he's saying is I did this additional, this second testing in California to see whether I could commercialize the thing. And as I understand the cases, the testing for purposes of determining whether it would be a good product, whether it would sell, is not experimental use. It has to be testing to determine whether it would work for the intended purpose. He doesn't say commercialize. He's not... He does. And he says all of these factors you're talking about, those were all commercial issues for developing a device, correct? He says correct. Well, that's not... that's much different than I needed to commercialize it. These are commercial issues. But I think the inventor is looking at that as, hey, are we able to roll this out to a population? I don't think that... this isn't, can you commercialize it? That's a much different term than a commercial issue. A commercial issue to an engineer. And we all know how engineers interpret things, and especially engineers in a deposition. Isn't your answer also that this was evaluated by a jury, and that's what juries are supposed to do, evaluate testimony? This is exactly right. We've had numerous individuals saying that, look, we wanted to make sure that we had it on multiple intersections, that it would work. On the second... And he says on line 24 on 2538, he says, and then you demonstrated that you could make it work in January of 2002. That's before this second experiment. He says, right, and your witness says, yes. Demonstrated that you could make it work in January of 2002. And he says, yes. Make it work is much different than make it work for its intended purpose. Make it work means I can flip a switch and it lights up. That's making it work. Stretching out two things across a parking lot is making it work. Making it work in a conduit filled with water, sand, and mud, and sending digital data signals. I need to describe a little something. There is, if I walk over to that wall and flip the light, the light's going to go on. You're just sending power to the light. You flip it on. I can have that cord go a mile and flip it. It's going to go on. Why? Because power is pretty strong. It's durable. It's not going to have a whole lot of problems because of interference. When you're sending digital data, it's a much different ballgame. And that's digital data. That is instructions in digital form. The problem is that twice here he says, in January of 2002, after the first experiment, I knew that it worked. He says that twice. And John McGaffey said exactly the contrary. We were not. Who's John McGaffey? He's the president of Polaro. There is a reams of testimony, including from this inventor. Where's the reams of testimony? Multiple intersections. 2234, talking about the number of intersections. 2243. It's not going to get anywhere just by reading its numbers. Where's the testimony? It's imperative that you test a system and it's true. So where are you? I'm at 2234 and line 22. That you test a system in its true live working environment to make sure that it works. Please go back to the microphone because you've been recorded. Oh, my fault. I'll bring it over. To make sure that it works the way it's supposed to. He did that with the first test. What is he talking about, the necessity for the second test? No, no, no. The first test was the work. He's talking about making it work. He's talking about the parking lot. Stretching it out in the parking lot and flipping a button and making sure that the light went on. 2240. Every intersection has different equipment, different lengths of wire. I'm at line 25 spreading into 2241. And based on the facts, we knew that noise, electrical noise from high voltage was a problem and a concern. We felt that it would be necessary to test on more than one, ideally three intersections. Now, I want to address something that was said. I believe you said it, Judge Scheich, which you weren't testing the claim elements. That's not true. What was tested and what was changed in both instances, in both the first intersection, there was a change made. They had a change from, I believe it was a transformer to an inductor. I'm sorry. I think it was an inductor to a transformer. It was because the digital data signal, which is explicitly part of the claim. What was the change that was made after the second? They had to change. They had to basically pump up the volume on the second one because this was a three intersection because of the way the streets came together. It was a different configuration. And because of that, they had to adjust that as well. They had to do it. This was an in-the-cabinet adjustment. They didn't pull it out, but they went and they adjusted it. And then the final piece of the puzzle was, hey, and this is where Manville Sales comes directly on point. Manville Sales said, the language from the case, no basis for confidence that this would work. No basis for confidence this would work. And prior to testing in the winter, it's on the street. It's a light thing. They've got to make sure that it can actually withstand being on the street exposed to the elements. There was no basis. Making it work doesn't mean making it work not once, not twice, but a thousand times. Well, then, if I agreed with you, how long does one have to test? One can't test for 10 years because the system's going to be around for 20 years. I think in the city of Linlith, they believe the period was something like four years. But that is an issue for the jury. That is an issue for the jury, where the jury can come and say, you took too long. Look at all this. You took too long. But what the city of Elizabeth says is, was this a bona fide effort to test an invention? Was this a bona fide? If it wasn't a bona fide effort to test an invention, I don't know what it was. He talked a little bit about a marketing letter. So there's a quid pro quo. If you look at the quid pro quo, this letter, it was, we will install it. We will maintain it. We will de-install it. And at the end of it, we'll install a new one, all at no charge. So not only did they not get paid for it, they installed a first system, and they said, no problem. Thanks for your help, city of Fullerton. We'll install a second system. Cobra Electric, there's all these documents saying, we're still testing. This is the Canada. Can I just turn you briefly to the enhanced damages award? I'm sorry. The enhanced damages award. So let's just set aside the jury's verdict on Wilfred's sentence and correct. It seems to me that there's still a potential problem here in that this public use defense is certainly a very good argument. Or at least I think it is. I mean, we spent most of our morning on whether this is a valid public use or not. Where did the district court properly take into account the strength of the public use argument before awarding enhanced damages? Well, there's the timing issue. This is a litigation development. Sure, but he still has to take it into account. Willful infringement does not automatically lead to enhanced damages. Certainly. But the judge went through the read factors. I'm asking you, where in the district court's opinion did it take into account the strength of the public use defense in determining whether enhanced damages were proper? He clearly took into account. Where? Well, I'm not in the actual enhanced damages portion. I don't recall this argument we raised. I didn't look specifically at it. I don't recall him saying in the enhanced damages board. We conclude that the district court didn't even consider this public use defense in determining whether enhanced damages was appropriate or not. Shouldn't we remand? No, not at all. The district court was sitting there every day during the whole public use. But if he ignored the public use defense, then it was improper. Well, then show me where he considered it. I don't believe there's a requirement that in enhancing damages you specifically address in the section called enhancing damages every single defense. Sure, but we have to understand his opinion. And if we think this is a really, really strong defense and that it would have been error not to properly consider it, and if we can't tell whether he considered it or not, then we should remand it. Well, he certainly considered it at length. He considered the defense. Obviously, right? In his rule 51. He seems to say that it was a weak defense. I think that's correct. Well, if we disagree with that and we think it's not a weak defense or a strong offense, even if it didn't prevail, then don't we have to send it back? I don't think so. The question is not whether you disagreed with him. The question is whether he abused his discretion. The question is whether he made a mistake in making his determination. If he made a mistake, then you have to set it aside, right? No, not under an abuse of discretion standard. No? Really? Not under an abuse of discretion standard. See, I thought there were plenty of cases that say even under an abuse of discretion standard, if the district court makes a mistake in the analysis and it's not harmless error, it has to go back. The last part I think you said. Here, the idea that there's one factor that you think he weighed too little. I guess it's he weighed it too little, I think is the argument. He did not weigh that defense sufficiently. Well, let me ask you this hypothetically. If he didn't weigh it at all, if he just ignored the public views, it would be an abuse of discretion, right? I think if he completely did not even pay attention to it, a defense raised by that is not yes. But in this case, I don't think there's anything you can look at. If we disagree with him on the strength of the defense, do you think it's not an abuse of discretion? It's not an abuse of discretion in that. I mean, that is kind of the epitome of discretion. Hey, I think I would have, Judge Hughes, weighed this more heavily. I would have weighed this issue more heavily. I mean, the problem with his decision, at least for me, is he goes through and spends a lot of time explaining why the jury is correct on willful infringement. And it's not going to overturn that. And then almost proceeds automatically to award enhanced damages without considering under HALO whether there are other reasons that would prevent award. And if that is truly the case, I don't think there's enough here to find that, but if that's truly the case, that's legal error, isn't it? Willful infringement does not automatically require enhanced damages. That is true. His opinion comes pretty close to that. No, I wouldn't say that. I think he handled, as you saw, a very exhaustive Rule 50 motion. Not on enhanced damages, though. Well, he certainly handled all the— He had a very exhaustive opinion on why the jury was right about willful infringement. And then he kind of just leaps to enhanced damages. Well, he also had a lengthy discussion of the Rule 50 motion and the prior use defense and goes through the clock spring factors and goes through each of them and finds that the clock— I mean, similar to the discussion earlier, that the clock spring factors overwhelmingly point to experimental use. And— Thank you, counsel. Speaking of clock spring, we have to look at this clock. It shows a red light. Let's hear a rebuttal from Mr. Holland. Yes, Your Honor. Just very briefly, to go back to the issue that you were discussing with my opponent on the various factors, and I agree with Judge Hughes and all of you, really, about I don't want the factors rewritten. I think some of them support each of us. The question, I think, in this case, especially with these very unique facts where you have this extremely long length of time and you have no documentation to show that it even was experimental contemporaneous with the supposed experiments, I think that creates a very dangerous standard for anyone to be able to drive a truck through on any type of usage if this is allowed to be called public usage. So that's the concern I have is that there needs to be— You mean experimental usage? Correct, Your Honor. Correct. The idea that you can say this wasn't a public use, even though we have all the factors met of ready for patenting and reduced to practice, because of this supposed experimentation, when you have no documentation, you have nearly three years, 33 months of usage before you go to the patent office, I think that's problematic as a standard. That's first. And then secondly, if I could just briefly on the HALO issue, I absolutely agree with Judge Hughes, as you might expect. I think that this is dangerously close to simply saying the jury was right on willfulness, therefore I'm going to multiply the damages by two and a half. And I think the factors of HALO are not nearly met here. We've outlined that substantially. There's no egregious nature here. There's no piracy. Opinions of counsel were sought. A lot of consultation was done. And to the judge's point, I don't think any of those were really considered. I think it was—Judge McCormick's a very good judge. I've been in front of him in other proceedings. I think he was trying hard. But unlike this panel and this court, he is not an expert in patent law. And so I think if this panel disagrees with his finding, that's meaningful. This was his very first patent case. And so for him to say, I think that this is—public use is not there, and therefore I'm going to just discount it, I don't think it's appropriate. And I think it's perfectly appropriate for this panel to revamp for at least the issue of enhanced damages to be tried again.  If you have no further questions. Thank you, counsel. We'll take the case under advisement. Thank you.